

SIGNED THIS 8th day of March, 2023

THIS MEMORANDUM OPINION HAS BEEN ENTERED ON THE DOCKET. PLEASE SEE DOCKET FOR ENTRY DATE.

Paul M. Black
UNITED STATES BANKRUPTCY JUDGE

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ROANOKE DIVISION

| | |
|---|---|
| In re: ) | |
| ) | Case No. 23-70004 |
| **CAVALIER PHARMACY, INC.** ) | |
| ) | Chapter 11 |
| Debtor. ) | |
| | |
| **CAVALIER PHARMACY, INC.** ) | |
| ) | |
| Plaintiff ) | |
| ) | |
| v. ) | Adversary Proc. No. 23-07002 |
| ) | |
| **HEALTH MART ATLAS, LLC** ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

This matter comes before the Court on a Motion for Temporary Restraining Order and Preliminary Injunction filed by the Debtor/Plaintiff, Cavalier Pharmacy, Inc. (hereafter "Cavalier" or "Debtor"), on January 18, 2023 seeking to require Health Mart Atlas, LLC (hereafter "HM Atlas" or "HMA") to turn over funds the Debtor contends belong to it. HM Atlas filed an Objection thereto.

**STATEMENT OF THE CASE**

The Debtor is an independent retail community pharmacy in Wise, Virginia. HM Atlas is a Pharmacy Services Administrative Organization ("PSAO"), which, among other things, coordinates receivables processing and drug pricing contracts for supplies to pharmacies like the Debtor. HM Atlas has approximately 6,200 participating pharmacies in its network, including the Debtor.

A lengthy evidentiary hearing was held on the Motion on January 25, 2023. Brian Blanton, the Debtor's CPA; Rick Mullins, owner and president of the Debtor; and Mary Heitzman, Director of Risk Management for HM Atlas, testified. Blanton, the Debtor's CPA, discussed the Debtor's past financial performance and profitability, and its likelihood of maintaining that profitability on an ongoing basis. Mullins, in turn, a pharmacist, described the Debtor's business and the vital services it supplies to the rural Appalachian community where it is located, including compounding drugs for adults, infants and patients with special needs. The Debtor also provides delivery services and drugs for veterinary services not found at other pharmacies in the surrounding areas. If the Debtor were not able to provide these services, many of its customers would have to go to a larger metropolitan area like the Tri-Cities area of Virginia/Tennessee, or for those coming to the Debtor across the nearby state line from Kentucky – to Lexington, Kentucky in the other direction.

The Debtor asserts that as of the "Petition Date, the Debtor was due monies from accounts receivable, or monies due to Debtor from insurance companies for prescriptions filled for customers of the Debtor, in the amount of $280,000.00; additionally HMA has refused to turn over the monies due to Debtor since the Petition Date, and HMA continues to withhold all funds due to Debtor, which the Debtor estimates now to be approximately $300,000.00 . . . ." Motion,

¶ 1. Cavalier further asserts that HM Atlas "does not have claim for setoff or recoupment because CVS Caremark, an insurance company of some of Debtor's customers, alleges Debtor owes CVS Caremark money as a result of an audit performed by CVS Caremark. CVS Caremark claims it is owed approximately $1,041,272.21 from the Debtor." Motion, ¶ 3.[1] Mullins testified that approximately thirty to thirty-five percent of his revenue is generated from CVS Caremark, but HM Atlas is withholding money under a contractual claim of recoupment not only from CVS Caremark, but also from other insurance companies (Anthem, Humana, Medicaid, Medicare, for example) to offset the alleged overpayment by CVS Caremark.[2]

HM Atlas asserts that the Motion should be denied as the Debtor failed to meet its burden in demonstrating that the "extraordinary remedy" of a temporary restraining order or preliminary injunction is warranted. HM Atlas asserts that it possesses valid recoupment and setoff rights with respect to the funds at issue; therefore, the Debtor's underlying turnover claim will not succeed, and the Debtor is not entitled to preliminary injunctive relief.

The Debtor and HM Atlas are parties to a Pharmacy Participation Agreement (hereafter "PPA") "pursuant to which HMA markets networks of independent pharmacies (such as the Debtor) to 'Payors' (*e.g.,* prescription drug plans and the like), enters into agreements with Payors governing the submission of covered pharmaceutical reimbursement claims and payments, and processes pharmacy reimbursement payments on behalf of the Debtor in exchange for a monthly fee."[3] Objection, p. 2. HM Atlas asserts that the PPA expressly

---

[1] Mullins also testified to the source of the dispute with CVS Caremark, which arose suddenly in the Fall of 2022. According to Mullins, the origin of the dispute lies in the billing for KN95 masks sold by the Debtor in packs with multiple masks. Mullins believes that CVS Caremark claims the Debtor overbilled by billing for five masks when it should have billed for one pack of five masks. Mullins contends this is incorrect, in that selling masks for the price CVS Caremark contends is accurate would result in the Debtor selling below its cost. The Debtor has been unable to effectively communicate with CVS Caremark to challenge the audit, and with its receivables cut-off by HM Atlas, it has no funds to do so.
[2] HM Atlas's witness put the percentage closer to forty-eight percent.
[3] The PPA was filed as Plaintiff's Exhibit 3, ECF No. 9.

3

provides for recoupment rights in favor of HM Atlas for amounts received from Payors in the event HMA "determines that the Debtor is, or is reasonably anticipated to be, subject to a negative charge, recoupment, true-up or other fee or clawback from a Payor." *Id.* When asked by the Court about relevant portions of the Agreement and explanations of portions thereof, counsel for HM Atlas conceded the reimbursement procedures under the PPA were admittedly "byzantine." The portions of the PPA relevant to the resolution of this matter are highlighted below.

The PPA defines "Payor" as "any private or governmental entity or company including, but not limited to, employers, union groups, associations, insurers, health maintenance organizations, pharmacy benefit managers, pharmacy benefit administrators, or third-party administrators, that has contracted with HEALTH MART ATLAS to offer Participating Pharmacies the opportunity to participate in a Payor Plan." PPA, ¶ 1.6.

Paragraph 2.2 of the PPA provides as follows:

> HEALTH MART ATLAS will enter into Payor Agreements that set forth: (i) the criteria for Participating Pharmacies to provide Covered Pharmacy Services to Covered Persons under a Payor Plan; (ii) the criteria under which a Payor is obligated to make payments to Participating Pharmacies or, if Payor utilizes the Consolidated Reimbursement Program[4] in accordance with Section 6.1, to HEALTH MART ATLAS on behalf of Participating Pharmacies for Covered Pharmacy Services rendered by Participating Pharmacies to Covered Persons; (iii) a reimbursement methodology for Covered Pharmacy Services provided by Participating Pharmacies; (iv) the timing for Payor to make payments to Participating Pharmacies, or HEALTH MART ATLAS on behalf of Participating Pharmacies, after receipt of a completed claim form from a Participating Pharmacy; and (v) a process for Participating Pharmacy to appeal payment denials or otherwise substantiate the right of payment in the event payment is withheld or recouped by Payor.

The PPA also contains an appointment of HM Atlas as attorney-in-fact for Cavalier, providing as follows:

---

[4] "Consolidated Reimbursement Program" is an undefined term in the PPA.

> PHARMACY hereby constitutes and appoints HEALTH MART ATLAS the true, lawful, sole and exclusive attorney for PHARMACY, with full power of substitution, in the name of PHARMACY for the following purposes: (i) to enter into any and all Payor Agreements and contracts in the name of PHARMACY, in accordance with the terms of this Agreement; (ii) to collect, receive and manage on PHARMACY's behalf, accounts receivable generated by billings and claims for reimbursement as more fully set forth in Section 6.1; and (iii) to take custody of, endorse in the name of PHARMACY, and deposit into PHARMACY's account, any notes, checks, money orders, insurance payments and any other instruments, received in payment of such account receivables for Covered Pharmacy Services or other services provided under or in connection with Payor Agreements.

PPA, ¶ 5.1.  Article 6 of the PPA is entitled "Pharmacy Charges, Reimbursement Procedure and Billings."  Paragraph 6.1, "<u>Pharmacy Reimbursement and Health Mart Atlas Recoupment Rights</u>," provides as follows:

> (a) PHARMACY acknowledges and agrees that Payors may elect to pay PHARMACY and other Participating Pharmacies directly for Covered Pharmacy Services provided by PHARMACY to Covered Persons under Payor's respective Payor Agreement ("<u>Direct Payment</u>"), or to pay HEALTH MART ATLAS on behalf of PHARMACY (the "<u>Consolidated Reimbursement Program</u>") for such services. . . .
>
> (c)  PHARMACY acknowledges and agrees that if PHARMACY, either directly or as a result of participation in a network, is or is reasonably anticipated by HEALTH MART ATLAS to become subject to a negative charge, recoupment, true-up or other fee or clawback from a Payor, or otherwise has a debit balance for one or more of Pharmacy Locations, HEALTH MART ATLAS may, at its option: (i) withhold funds received under the Consolidated Reimbursement Program from future payments to PHARMACY until such time as PHARMACY's balance for all Pharmacy Location(s) for all Payors is zero dollars or above, (ii) debit PHARMACY's bank account for the negative amount, or (iii) invoice PHARMACY for such negative amount, which sum will be due and payable with [sic] five (5) business days following HEALTH MART ATLAS' delivery of invoice (collectively, the "<u>Recoupment Rights</u>").

PPA, ¶ 6.1.  Paragraph 6.2, entitled "<u>Withhold of Funds for Network Obligations</u>," provides as follows:

> PHARMACY acknowledges and agrees that HEALTH MART ATLAS may, in its sole discretion, establish a contingency reserve fund or funds (the "<u>Withhold Funds</u>") that may be used by HEALTH MART ATLAS to satisfy any existing or anticipated financial obligation of HEALTH MART ATLAS arising from its rights

5

>and duties under this Agreement, including without limitation the satisfaction of negative charges, recoupments or fees sought by a Payor for one or more of HEALTH MART ATLAS' networks. PHARMACY further agrees that if any Withhold Fund is insufficient to cover the financial obligations of HEALTH MART ATLAS, then PHARMACY's proportionate share of the amount of the deficit may be withheld from PHARMACY's next payment or payments in order to satisfy HEALTH MART ATLAS' financial obligation.

PPA, ¶ 6.2.  Finally, paragraph 12.8 of the PPA provides as follows:  "This Agreement is intended for the exclusive benefit of the parties to this Agreement and their respective successors and assigns.  Nothing contained in this Agreement shall be construed as creating any rights or benefits in or to any third party."

In support of its Objection, HM Atlas filed a Declaration of Mary Heitzman, Director of Risk Management, who also testified at the hearing on January 25.  ECF No. 6, Exhibit A.  Ms. Heitzman states that HM Atlas "has contracted with Caremark to participate in Caremark's pharmaceutical plans on behalf of the independent pharmacies under contract with HMA, including the Debtor (the "<u>Participating Providers</u>").  Caremark makes aggregate payments – defined as "Central Payments" – to HMA on account of pharmacy services provided by the Participating Providers, which amounts HMA distributes to the Participating Providers entitled to such funds.  Caremark may offset against all or any portion of a Central Payment amounts owed by any Participating Provider, including claim reversals or adjustments or fees." *Id.,* ¶ 5.  She goes on to state that HM Atlas received notice that Caremark was conducting an audit with respect to certain reimbursements paid to the Debtor and "[i]n accordance with the terms of the PPA, HMA began to withhold payments from the Debtor at that time." *Id.,* ¶ 6.  Ms. Heitzman further states that as of the petition date, approximately $284,257.95 was held by HM Atlas pursuant to the PPA.  On December 21, 2022, CVS Caremark informed the Debtor that it completed a review of the audit and that the total overpayments plus applicable fees total

6

$1,041,272.21 and that "[a]s authorized by the Provider Agreement, and in accordance with applicable state Law, Caremark may begin withholding funds from future claims payments." ECF No. 10, Plaintiff's Exhibit 4.[5]  HM Atlas has continued to withhold such funds from the Debtor since that time.

After requesting the opportunity to discuss matters after the conclusion of evidence, the parties announced that they were able to reach an interim agreement to resolve certain of the issues presented.  By Interim Stipulated Order entered January 26, 2023, among other things, HM Atlas was to disburse $80,000 to Cavalier to be used by the Debtor solely in accordance with the budget attached to the cash collateral order and in the ordinary course of the Debtor's business.  The Motion was then continued to February 17, 2023 for further hearing.  Prior to the scheduled hearing, the parties submitted a Second Interim Stipulated Order that continued the hearing to March 3, 2023 while the parties continued discussions.  Unable to resolve their issues consensually, the Court heard final argument on the Motion and took the matter under advisement.

## JURISDICTION

This Court has jurisdiction of this matter by virtue of the provisions of 28 U.S.C. §§ 1334(a) and 157(a) and the referral made to this Court by Order from the District Court on December 6, 1994 and Rule 3 of the Local Rules of the United States District Court for the Western District of Virginia.  This Court further concludes that this matter is a "core" bankruptcy proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), (E) and (O).

---

[5] Included within the $1,041,272.21 is a twenty percent "audit fee."  No agreement between the Debtor and CVS Caremark was introduced by either party.

**CONCLUSIONS OF LAW**

A preliminary injunction is an extraordinary remedy, warranted when a plaintiff can make a clear showing it is entitled to relief. *Roe v. Department of Defense*, 947 F.3d 207, 219 (4th Cir. 2020). "Though an 'extraordinary remedy,' a preliminary injunction is warranted where the plaintiff has established 'that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Doe v. Wake Forest University*, C.A. No. 1:23-CV-00114, 2023 WL 2239475, *1 (M.D. N.C. Feb. 27, 2023) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 24 (2008); *Dmarcian Inc. v. Dmarcian Europe BV*, case numbers 21-1721, 21-2005 and 22-1728 (4th Cir. February 14, 2023)).

In this case, three of the four elements tip decidedly in the Debtor's favor. Irreparable harm will no doubt befall the Debtor if it is forced to close its doors because HM Atlas can essentially reduce its income stream to zero. The owner/pharmacist, six full time employees, and two part time employees will likely no longer have employment in a region where jobs are scarce. The balance of equities favors the Debtor in that HM Atlas services approximately 6,200 independent pharmacies, and the cash flow it administers and the revenue it receives is clearly substantial. This is but one pharmacy in HM Atlas's massive network, yet one with a positive cashflow desperately seeking to reorganize and continue its services to the community. It has limited ability to challenge the results of the audit CVS Caremark indicates has resulted in an alleged $1,000,000.00 plus overpayment (with audit fees), and not only are receivables from CVS Caremark withheld, but based on Paragraph 6.1(c) of the PPA, every source of receivables administered by HM Atlas through its Consolidated Reimbursement Plan to the Debtor is being recouped for application against the CVS Caremark overpayment.

Arguably, the strongest factor weighing in favor of the temporary injunction is the public interest.  Closing this independent pharmacy, which provides a wide range of unique and critical services to this rural community, will be devastating to the Debtor, to the town of Wise, to Wise County, and to residents of the surrounding areas – some of which will have to go as far as Kingsport or Bristol, Virginia (one hour) in one direction or Lexington, Kentucky (three hours) in another to obtain necessary medicines, especially ones that need to be compounded.  It will be a tremendous loss to the community.  The public interest would be served by a temporary injunction.[6]

This leaves likelihood of success on the merits.  The Debtor argues that this test can be met by showing, in the context of a bankruptcy case, that the debtor can put forth a viable plan of reorganization, citing *In re Larmar Estates*, *Inc.*, 5 B.R. 328, 331 (Bankr. E.D. N.Y. 1980).[7]  The Debtor contends that its ability to confirm a successful plan of reorganization is high, because, if its receivables can be recovered, it has positive cash flow to fund a plan of reorganization.  Unfortunately, this is not the proper test.

When showing requisite likelihood of success on the merits for purposes of preliminary injunctive relief, although a plaintiff need not establish a certainty of success, it must make a clear showing that it is likely to succeed at trial.  *Roe*, 947 F.3d at 219.  The preliminary injunctive relief sought here is sought in the context of adversary litigation, not of a plan of reorganization.  The Debtor seeks turnover of the funds allegedly improperly withheld pursuant

---

[6] The Court also questions how HM Atlas and CVS Caremark expect to be paid back if the Debtor closes its doors. Powell Valley National Bank has a lien on most of the Debtor's assets securing a loan of approximately $250,000.00.  Presumably, the Debtor is current on that loan as counsel for Powell Valley National Bank has not indicated otherwise.  ECF Nos. 6, 24 in the main bankruptcy case.

[7] *Larmar* also spoke in terms of a plan providing a 100% payment to creditors which could be confirmed in the near future.  *Larmar*, at 331.  No such evidence was advanced in this case, and the Court is unaware of any Fourth Circuit precedent following *Larmar*.  Instead, the Court must follow established precedent on temporary injunctions in this Circuit.

11 U.S.C. § 542, a finding that HM Atlas has violated the automatic stay, and that injunctive relief be awarded. ECF No. 1. The Debtor needs to show clear likelihood of success at trial on the claims alleged in this litigation to prevail. This it has not done.

To cast a withholding as recoupment, the party asserting recoupment "must first establish an overpayment was made, and second, both the creditor's claim and the amount owed to the debtor must arise from a single contract or transaction." *In re Fischbach*, No. 1:12-cv-00513-JMC, 2013 WL 1194850, at *2 (D. S.C. March 22, 2013)(citations omitted). The automatic stay provided for in the Bankruptcy Code does not apply to recoupment, nor does the discharge injunction. *Id.* Moreover, and significant here, "[r]ecoupment is not limited to pre-petition claims and thus may be employed to recover across the petition date." *Id.* (citing *In re TLC Hosps., Inc.*, 224 F.3d 1008, 1011 (9th Cir. 2000)).

HM Atlas asserts that the doctrine of recoupment is "plainly applicable regardless of whether the Court employs the Ninth Circuit or Third Circuit's test for the 'same transaction' requirement" as the Fourth Circuit has not adopted a definitive test. Objection, p. 10. Citing *Fischbach*, HM Atlas defines the two tests as follows:

> The United States Court of Appeals for the Ninth Circuit applies "the more liberal 'logical relationship' test" in which the term "transaction" can include "a series of many occurrences depending not on their immediate connection so much as their logical relationship to each other." . . . In contrast, the Third Circuit Court of Appeals has applied the more conservative "integrated transaction" test, which requires that "the obligations at issue 'arise out of a single integrated transaction so that it would be inequitable for the debtor to enjoy the benefits of the transaction without also meeting its obligations.' " . . .
>
> The Fourth Circuit Court of Appeals has not adopted either theory, but several bankruptcy courts within the jurisdiction have suggested that the Fourth Circuit has implicitly endorsed the more conservative, integrated transaction test. *See id.* ("the Fourth Circuit and cases within the Circuit are closely aligned with the 'integrated transaction' test"); *In re Camellia Food Stores, Inc.,* 287 B.R. 52, 61 (Bankr. E.D. Va. 2002) ("the Fourth Circuit Court of Appeals nonetheless does

10

offer guidance in interpreting the same transaction by continuing to define recoupment as claims arising out of the same contract . . . [I]t appears likely the Fourth Circuit Court of Appeals will apply the integrated transaction test.").

*Fischbach,* at *3.

Here, the PPA is the singular contract the Court has before it. Practically, HM Atlas acts as a clearinghouse, where payments come into HM Atlas on the Debtor's behalf from multiple sources under Payor Agreements. PPA, ¶ 2.2. The Debtor appointed HM Atlas its attorney in fact to enter into any and all Payor Agreements and contracts in the name of the Debtor, and to collect, receive, and manage on the Debtor's behalf, accounts receivable and claims for reimbursement from Payors. PPA, ¶ 5.1.[8] The Debtor also agreed that if there is a negative charge, recoupment, or true up, which the Debtor has to a Payor (like CVS Caremark), then HM Atlas can do one of three things: (i) withhold funds received under the Consolidated Reimbursement Program from future payments to the Debtor until such time as the Debtor's balance for all Payors is zero or above, (ii) debit the Debtor's bank account for the negative amount, or (iii) invoice the Debtor for the negative amount, which is due in full within five business days. These are defined as the "Recoupment Rights" in the PPA.[9] HM Atlas has chosen to exercise the first option and is withholding every dollar received on the Debtor's behalf, from whatever Payor, until the balance with Payor CVS Caremark is reduced to zero, including the alleged 20% audit fee. This has strangled the Debtor's cash flow to the point it cannot function, but the Debtor has not made any persuasive arguments the express terms of the contract should not apply.

---

[8] The Debtor pays HM Atlas a monthly fee for its services, on which it is current. Based on the commentary at trial, it is difficult in today's world for an independent pharmacy to operate without the services of a PSAO.
[9] The Court has looked beyond labels and attempted to apply recoupment as it is defined in relevant caselaw.

11

There is a "single contract" here. It is the PPA. Netting out these payments is expressly permitted under the terms of the contract between the Debtor and HM Atlas. Recoupment of these payments is permitted under the contract with HM Atlas, the automatic stay does not apply, and post-petition payments can be netted against pre-petition balances. This is the nature of recoupment. *Fischbach*, at *2. True, the end debt is ultimately with CVS Caremark, but the Debtor agreed to appoint HM Atlas its attorney in fact to enter into the Payor contract with CVS Caremark on its behalf, and to allow payments received from CVS Caremark and other Payors under the PPA to be applied against the CVS Caremark balance until it is reduced to zero.

Normally, the Court would rule quickly on a request for a temporary injunction, but the Court has agonized over this result. The Debtor has the burden of proof here, and as much as the Court would like, it cannot manufacture a remedy out of whole cloth.[10] It must apply the law to the facts as submitted. The Debtor must prove it has a likelihood of success on the merits, and the test is will it be successful in this litigation where it seeks turnover of its receivables, an injunction, and a finding that the automatic stay is violated. The Court finds that the Debtor has not carried this burden.

A separate Order will issue.

---

[10] The Court considered *In re Gardens Reg'l Hosp. & Med. Ctr., Inc.*, 975 F.3d 926 (9th Cir. 2020), which neither party cited, for the proposition that the same transaction requirement may not be satisfied where a "logical relationship" is applied so loosely that multiple occurrences in a continuous commercial relationship would constitute one transaction. *Id.* at 934. *Gardens* held that "the test remains whether the relevant rights being asserted against the debtor are sufficiently logically connected to the debtor's countervailing obligations such that they may be fairly said to constitute part of the same transaction." *Id.* While the Court is concerned that the PPA allows the netting of not only the sums due the Debtor from CVS Caremark against the CVS Caremark debt, but also sums from other Payors unrelated to CVS Caremark, this is an integral part of the single contract that constitutes the PPA and the Court cannot disregard it.